Thank you, Your Honor. Good morning. May it please the Court. My name is Richard Olmstead, and I'm appearing today on behalf of the defendant, Schwan's Home Services. And would you move the microphone up just a little bit, so that'll help. Yes, Your Honor. Is that better? Yes, it is. Thank you. I would like to request three minutes for rebuttal, please. In this appeal, Schwan's asked the Court to ask what I believe to be a relatively straightforward legal question, and that question is one of policy. Does an employer in Montana have a good cause, as a matter of law, to terminate the employment of an employee who admits violating policy and admits engaging in conduct that potentially subjects the employer to violations of federal and state law? If the Court agrees that the answer to this question is yes, then I think it must also agree that the district court committed manifest error when it denied Schwan's motion for directed verdict and refused to modify the judgment. Well, your question is somewhat different than — your question in this case is somewhat different than can an employer terminate someone for violating this policy? It's can an employer terminate someone for violating this policy under the circumstances that were present in this case? If it were only an abstract question, can nothing else have occurred in this case except an employee violated a policy? You might have one answer. If you have a question that is — let me give you an example. Employer has a policy. For 10 years, everyone in the company violates it. No one is terminated. That's a somewhat different question. Well, I agree wholeheartedly with Your Honor, but here our arguments and our briefs and the arguments that I'll be making to you today are based on facts that are absolutely uncontroverted. In those facts, and I will address — That's all I said. Your argument is not simply what you said, can an employee terminate an employer for violating this policy. It's can an employee violate — an employer violate an employee for violating this policy under the other circumstances present in the case. Okay. And I will address those circumstances. And I'll agree with you on that point, Your Honor. In the circumstance you addressed is the argument that's been made that other employees, four swans, have violated this policy over the years and were not disciplined. What's lacking in the evidence — there is absolutely zero evidence — is that there is no indication that Schwann Senior Management, the decision makers in this case, had any knowledge of those prior violations. In fact, the evidence is uncontroverted that Roger Everett, the regional human resources manager who terminated plaintiff's employment, has terminated each and every Schwann's employee whom he's discovered has engaged in violations of this policy. How many employees were terminated? I don't know that Mr. Everett gave a number in his testimony, but the testimony was that on every occasion that has happened. So that may mean simply the plaintiff in this case. No, it's not. He indicated that there were, in fact, other employees, Your Honor. I can speak to others, but that's not in the record here. No. Okay. But I think, Your Honor, the more basic point is, is the argument that's being advanced by plaintiff is that if everybody else has done it and got away with it, that doesn't make it an accepted and condoned policy by the corporate employer. No, but it may be enough to get you to a jury on the question of whether or not the firing was arbitrary and capricious. And I gather that Judge Osby said there was enough evidence to get to the jury on that question because there was a factual dispute on whether or not the company had consistently enforced that particular rule. Isn't that what she was — that was her rationale? I don't know that that directly came through as being Judge Osby's rationale for the decision, but I'll address that with two points. The first is, as evidence that this termination was not whimsical or arbitrary or capricious, Schwanz also terminated the employment of Oliver Cornett, plaintiff's supervisor, for authorizing plaintiff to use a Schwanz employee who was, at that time, locked out of the payroll system because he was on a medical leave of absence, for authorizing use of him to unload trucks. The fact that they terminated Mr. Cornett in similar circumstances, I think, lends to the finding that this was not whimsical, fanciful, or arbitrary. And secondly, Mr. Everett's testimony that he has, in fact, terminated other employees for the very same reason may lead to the conclusion that it's not whimsical, fanciful, arbitrary. And then one last point, and that is, there is no evidence, none, that there was ever a situation where Schwanz senior management knew of a specific violation of this policy, the same act that plaintiff committed, and did not terminate the employment of that employee. And I think that's critical here. The fact is, is that Schwanz, the corporate employer who's headquartered in Marshall, Minnesota, can only act on the information that's available to it, on information that it actually possesses. It cannot be held to create policy or approve practices that it's not aware of, that it has no knowledge of. So the uncontroverted evidence is, is that when Schwanz senior management knows that these acts are being committed, it terminates the employment of every employee. Well, was it sufficient that the employee's immediate supervisor knew that lumping had been going on and was authorized? Your Honor, I don't believe so. Why not? I think what we have, in fact, not only — I mean, if the evidence was, and apparently there was some evidence, that this employee's supervisor knew of this situation. I'll explain why. It wasn't just this employee's supervisor that knew of this situation. The testimony actually was, was that lumping has been a problem primarily in the upper Midwest for Schwanz, and I believe for other employers in this type of industry. It's been a problem that the company has been trying to address. But one thing has remained unchanged throughout all times, and that is that Schwanz policy expressly and clearly prohibits paying employees outside of Schwanz payroll system or paying employees from petty cash or any other source of cash. Was there evidence presented that this employee's supervisor knew of this situation and tacitly or implicitly authorized it? No. As a matter of fact, what this — what the supervisor did know of, and this was one of the things that Plaintiff pointed to, was an email from his supervisor. Now — Right. He said go ahead and you can use it. I thought he said go ahead. Yeah. Well, there's a distinction. Okay? The email that it says was an email to Plaintiff, and it says, quote, please disregard our conversation regarding lumpers yesterday. Let's keep Matt lumping until we get him through the system. So, I mean, but your thesis is lumping is not permitted. You get fired for lumping. The immediate supervisor says, oh, no, you can't lump, but then retracts and says go ahead and use Matt for lumping. Now, I know that you have an explanation for that, but, I mean, the question is, isn't that enough to get to a jury on a factual question on whether or not they were tolerating the policy or not? I don't believe so, and for two reasons. The first is, is when the supervisor, Mr. Cornett, says let's keep Matt lumping. Let's remember that Matt is a current employee. He is not a non-employee. But the issue is lumping. Well, and Mr. Cornett explained in his testimony, lumping was a term used in the industry simply to unload and load the trucks, not a non-employee being brought in and paid in cash under the table, because that's clearly not the situation he approved here. He approved using Matt, who is a current Schwann's employee, who was just simply locked out of the payroll record. Well, except for this. You know, when he, the supervisor was concerned, so he goes up a level to human resources, and human resources says terminate him. And then he meets with him, and he says, what about this email you told me I could lump? And he says, well, you've got a point, and he suspends him instead of terminates him. So he knew that there was some miscommunication. And then, of course, we know the events later, that they were, that the company terminated both of them. But, I mean, the question is, is it enough to get to a jury, because the supervisor certainly had the power to hire and fire. He didn't need to go up to senior management of the company. Well, and here's why I don't believe it's enough to get to the jury, Your Honor. And that is, is the policy, as I explained, has always prohibited paying employees off the books. Plaintiff completed Schwann's Code of Conduct training. And Schwann's Code of Conduct specifically says that if you are directed to engage in unethical behavior or you observe unethical behavior, not only are you not to do it, you're to report it up the chain of command. And Schwann's provides multiple avenues to report that. You can report to the director of human resources, regional human resources management. There's a 24-hour hotline in which the report can be made anonymously. It's never been used, though, right? Plaintiff did not use that. No, no, nobody did. There was evidence that nobody had ever called the hotline, right? No, there's no evidence of that, Your Honor. None that I'm aware of that nobody used the hotline. The hotline is staffed 24 hours a day. I think it would be highly suspect for Schwann's to staff that 24 hours for it never to be used. You know, there's plenty of evidence in the record from Jorgensen, Cornett, and Blair. You may not believe Blair's testimony. But there's plenty of evidence that their lumping occurred regularly at the company. You know, Blair talks about where he learned of this practice, working for the company, that he hired his son on a number of occasions as a lumper, that his supervisors knew about all of this and approved it. You know, maybe he made it all up, but that's evidence that gets you to a jury. Well, I disagree, Your Honor, and we don't dispute that fact that the lumping was occurring. How regularly, I don't know that that's necessarily in the record. In fact, there is testimony that Plano's first exposure to Schwann's was that he was brought in in that situation to lump a truck. We're not disputing those facts. We admit that those things have happened. But if I could draw a comparison to some cases that happened not too long ago that made national news, and that's the Walmart cases where they were locking employees in and making them work after punching out. The fact that that was happening at an isolated store, maybe five or six isolated stores, does not impute that knowledge to the corporate employer that had no knowledge it was happening. Okay. Once the corporate employer, and in this case it's Schwann's, is in Marshall, Minnesota, once the corporate employer gains knowledge of this illegal practice, it takes action. And it should be allowed to take action regardless of whether other employees or other supervisors have done it in the past and gotten away with it. Supervisors have authorized this regularly in the past. And then you say that it finally came to the attention of senior management, but it had been regularly authorized by supervisors. You don't think a jury can determine that's enough evidence for a jury to say this is arbitrary, to terminate this individual when it's been a regular practice in the company? No, Your Honor, I don't. Because under those facts, I don't think the corporate employer who's bound to follow the law in this, in essence, would place them in violation of the law to not be able to act in this circumstance. The corporate employer should be entitled to act based on the information that it has and should not be handcuffed. What do you mean by the corporate employer? The corporate employer, Schwann's, the corporate entity, when it's regional managers, when it's senior management, finds out about this. The fact that lower level management or hourly employees have committed these acts under the radar without being caught should not be enough to stop the corporate employer from taking reasonable steps to protect itself, to protect its business interests, and to make sure that its employees are, in fact, following policy. What does senior management mean? If it's general motives, does that mean an executive vice president has to? Well, in this case, Your Honor, I think we're confined by the fact that senior management would be district human resource manager, regional human resources manager, and the director of human resources. Two of those are situated in Marshall, Minnesota. So obviously they can't be in all places at all times and see everything that's happening. Right, but the supervisors on site have the power to hire and fire, correct? It has limited power to hire and fire. They can't make those decisions without conferring with human resources up the chain. And where's that in the record? I'm sorry? Where's that in the record? I believe it would be in the handbook. I don't have the record site for you directly. But ultimately, I know this from past experience, what Schwann's handbook does say is that human resources has the ultimate say in any employment decision that's made. Now, that authority has been delegated in certain situations to lower-level employees that they can make those decisions. But in this case, that's not the facts. The facts are here that the decision was made at the regional level by Roger Everett. Roger Everett acted on the knowledge that was available to him, and his testimony is uncontroverted that in every single circumstance which he's been equipped with that exact same knowledge, he's terminated the employee. I think under those circumstances, Schwann's should have been granted judgment as a matter of law because it had good cause to terminate plaintiff's employment. Well, it doesn't help much to say in every single circumstance when it could be one circumstance or the second circumstance could happen afterwards. That's not very specific evidence. I'm not sure I understand your question, Your Honor. Well, it was more of a statement than a question. I said if there's the evidence that senior management terminated everybody that they ever found out was doing this, and that may be one person, or it may be one, the defendant, the plaintiff here, and another person afterwards, and we have no further evidence than that, that's not very specific evidence. It may not be specific, Your Honor, but it is uncontroverted. Let's say for the—we'll give you some time. Okay. Thank you, Your Honor. One quick hypothetical. I mean, let's assume you have two employees that come in. They're both lumping, and the supervisor—they've been lumping in the same truck at the same time, and the supervisor fires one for lumping and the other one he doesn't fire, and he's consulted with human resources. Now, a jury would surely be able to—that surely would go to a jury, would it not? Oh, absolutely. So you're really—your only argument in the question, perhaps a fact of the jury, is how far up the chain is permission required, right? Well, no, because in this case there was never any testimony that Craig Gehlen, the district supervisor, or Oliver Cornett, the local supervisor, had any authority over the termination decision. It wasn't Cornett that terminated Blair initially. It was made at the higher level, directed down to Cornett to communicate it to him. So it's a little different circumstance. We don't have Cornett saying, oh, I've authorized lumping in the past, but I'm going to fire you for this instance of lumping. We have Cornett following the direction of his supervisors who gained this information, saying this is against our policy. You need to fire him. That's when Cornett comes back and I think realizes that maybe what I've done in the past puts me in trouble too, and in fact it did. Your time has expired, and we will give you a couple minutes. Thank you, Your Honor. All right. Good morning. May it please the Court, it's an honor to be here this morning. I'm here on behalf of Steve Blair. He was my client, and he was terminated from Schwann's Home Food Service in Billings, Montana. I'm troubled by Mr. Olmstead's assertions that everything here is uncontroverted. I was present at the jury trial. Mr. Olmstead was not, and there are some assertions that he made that I'd like to address. Not only did Oliver Cornett, Steve Blair's supervisor, know about lumping and approve lumping, so did his supervisor before that, Matt Zimmerman. It's been going on. Matt Zimmerman and Oliver Cornett also themselves paid cash to people coming in to pick up cardboard at Schwann's and to remove snow from Schwann's. Oliver Cornett was terminated for lying during an investigation. He was terminated after all of this came out, and Steve Blair presented him with the email that approved him to lump. It's interesting to note that Craig Gellin, the supervisor of both of these gentlemen, was not terminated when he lied during an investigation. The credibility of witnesses is critical in this case, in my view. The jury, I think, has the ability to discern who's believable and who is not, and certainly the jury instructions in this case identified that. And based on all of the evidence, Steve Blair was an excellent employee. He satisfactorily performed his job duties. He had a problem. He had a truck to unload with 15,000 pounds of frozen food. He has strict time limits in which to unload that. He knew the problem was coming down the pipe, and he talked to his supervisor, just like Schwann's policy requires. He said, can we get some extra help on this? And it was in November. Schwann's, and this is on the record, Schwann's cut off using temporary workers at the end of the year as a cost-saving measure. So his supervisor, Beau Cornett, said, can't do that. Well, can we get other people to help us? No. Steve said, well, what about lumping? Beau Cornett said no. After all of these things were discussed, Steve gets the e-mail from Beau Cornett that says, disregard our discussion on lumping yesterday. Go ahead and do it. Schwann's made quite a showing at trial about this Matt Halstead issue. Matt was not working. He was not being paid by Schwann at the time. It's interesting that Schwann did present evidence that it cleared up payroll in regard to Matt Halstead, who was in the process of being hired, but they did nothing about Artis Bott, who was actually the man who did the lumping. Let me ask you a hypothetical. Let's assume that the company has found people embezzling. Is it a defense, do you think, that to say you can't fire me because there have been other embezzlers in the past? No. I think that there is a clear distinction between embezzling and taking money for yourself than doing a time-honored practice that was approved by the company, it was admitted to by the company, and it was for the benefit of the company. Judge Osby clearly shows that Steve was not dishonest in her order denying Schwann's motion. She indicates that Steve was very honest and that all the steps he took were to benefit the company. The company, I don't disagree that they were trying to taper the policy off, but Steve didn't know about it. This policy had been practiced, and Mr. Olmstead calls it a problem. It was, in fact, a practice by Schwann's. They admitted to this, and while a lawyer argues that it was Steve Blair that they're always talking about, that's not the reading that I certainly take from the admission that Schwann made, because I asked them, do you admit that your employees used lumping from 2001 to 2008? They admitted that. Then I asked, does Schwann, the corporate entity, use lumping in the course of its business practices from 2001 to 2008? And they admitted to that. I think if they were relying on this being Steve Blair, they could have easily denied the admission and explained that Steve Blair was the only one they're aware of. Lumping was going on in other towns, in other depots, in other states. It was a wide practice. Steve was doing it to benefit the company, and there's absolutely no reason he should have been fired, and certainly there's vast evidence that the jury could have found that getting permission from his supervisor, that the practice was used by Schwann's in the past, that Steve looked at all the other options he had, and under the circumstances of his job, which was to get frozen food into the freezer and out to make Schwann's profits, he was doing a good job for the company. Do you think it makes a difference if the practice is, in fact, illegal, and by that I mean that no wages are withheld, various state and local regulations and laws might have been involved? In other words, what I'm saying is you can have a corporate practice that might be against corporate, or a practice in the field that might be against corporate policy. Does it make a difference if it's arguably illegal? I mean, that was the position of Schwann's. I'm not making that up. Certainly that's an argument, Your Honor. However, in Johnson v. Costco, the grazing policy case, and Schwann points out that that was good reason to fire in its opening brief, and it was not. That summary judgment was overturned. He was fired for grazing, which is taking food, and Costco's policy was if you don't pay for it, don't eat it. So that could have technically been stealing. Right, but I guess that's the distinction I was trying to ask about, because in Johnson's, grazing is not against the law. It's maybe against corporate policy. Here, arguably, that paying people off the books violated some state and local federal laws on taxation. So the question for you is, does that make a difference in this case, and if not, why? Well, I think it depends on the level of illegality. Again, if I refer to the Costco case, taking — You mean if it's just a little bit illegal, it's okay? Well, I'd like to know what you mean. I mean that taking a bite of a pastry is technically theft from your company, but I think it's when you're in the course of your daily activities, it's kind of accepted. Okay, but this is hiring someone off the record books. And if that is illegal, if, you think that's not relevant in this case? I do think it's relevant, Justice O'Connor. I think that Steve's position was such that his focus was on getting the truck unloaded, and he just — Yeah, there's no doubt about that. I mean, I accept the record. He — the practice was — there was evidence that the practice was common. There was evidence, clear evidence. He didn't benefit personally. He was just trying to get his job done. My only question is, given all that and construing the facts and, like, most favorable to your client, because we're here after a jury trial, what about the illegality of it? I mean, that seems to me that may make a difference between this case and, say, the Costco case. Well, the illegality is something that was not — Alleged illegality. Sorry? Alleged illegality. The alleged illegality was not addressed by Schwanz at summary judgment stage. It was not given as a reason for — as a specific reason for his termination. They were policy violations. And Steve, I think, successfully discredited all of those alleged policy violations at trial. The illegality question was raised after the trial. And I believe that it's an issue. Certainly, I can't say that I condone an employer committing illegal acts. But I do think there is — it has to be weighed based on where did he — where did he understand? How did this come about? And this was — Steve lumped when he first started for Schwanz back in Belgrade in 2001. And I don't — I have no question about that. I mean, the record is pretty clear that there was lumping going on all over the place. I mean, I'm not — I'm not — by my question, I'm not suggesting that there wasn't. But the question is, is there a distinction between that and Costco? And you think not. Was Costco — Costco, the employee, ate food? He violated the grazing policy. Oh, he did not use grazing. Yeah. But what — He was a — he was a — Mr. Johnson was a — Wasn't that a violation of the health codes? He was a baker, and he ate a pastry. And he was terminated for it. But this was after there was — this was — that's an interesting point. This was an accepted policy. It was a policy violation at Costco, but it was routinely violated. And then a manager came in and said, we're going to have zero tolerance for grazing. There was a meeting, and everybody knew about it. And Mr. Johnson violated it. And that still went to a jury because of the outside facts that he brought in that could have shown that it was arbitrarily applied, just like this case. He was having his cake and eating it, too. Well, there's — it's a serious question, though, I think, on — and I realize it came up late in the case. It came up after the trial. But there may be circumstances where an — I guess the question is, can — even if firing is arbitrary, if it's for an illegal act, is that permissible? As I read Johnson v. Costco, and as Judge Reinhart sat on a panel in the Marcy v. Delta Airlines case, and in that case, the judge — or the flight attendant, I believe, had wrote down that she was entitled to $250 in wages when, in fact, she was off on comp time and on vacation time. And the company, Delta, firmly believed that she was lying and that she was stealing. The jury — the panel said that it should go before a jury because there was sufficient facts. And after it was all said and done, the jury did rule in her favor based on hearing all of the evidence. Okay. Any further questions? I think we have your argument at hand. Thank you. Thank you. I'll give you two minutes for rebuttal. Thank you, Your Honor. The Costco case fact question I think is an important distinction here. In Costco, the reason that the court said this is a fact issue was because the specific examples were provided where management knew of grazing and did not take that employment action. That's not the case here. Big distinction where we have the decision-makers acting on what they know. In the evidence of other people engaging in this conduct and not being terminated, the decision-makers had no knowledge. And I think that distinction is critical. Well, except that Costco seemed to say that what the employee thought about what the company was doing and what they know was a consideration. I don't know that I agree with that reading from Costco, Your Honor, but I think if we step back and look at that globally, I think that's a very scary prospect, that we're now going to be bound by the employee's subjective belief of what is right and what is wrong and what is allowed. No, what he thought the company's belief was. What he thought the company's belief was. Again, I don't think that's relevant, Your Honor. I think what is relevant is what is the company's policy, what is the company saying about this, and the fact that everybody else is doing it and getting away with it should not change that. Where do we stop? As you know, Montana, the Montana Supreme Court has been fairly pro-employee in these cases. And I think in Costco, as a fair read, is that they said the reasonable expectations of the employee are relevant, even if they were incorrect. And so the argument would be in this case, he had a reasonable expectation he could lump because there had been lumping and he didn't know that he couldn't lump. He asked permission to lump and they said okay. Why isn't that permissible to go to a jury on that question under Montana law? Well, the reason being, Your Honor, is that I think it has to be an issue that is a matter of law. Based on the facts that are admitted, based on the policies and the potential violations of law, that has to be a question of law that should be decided by the judge. And the reason being is, and I'll just pose this hypothetical, but where does it end? Is Schwanz forever prohibited from terminating employees who lump in Montana because people have, and the testimony is uncontroverted, people have lumped in Montana and gotten away with it for many years. Does that mean Schwanz can never take employment action for somebody that finds lumping? Because the policy hasn't changed. The law hasn't changed. Nothing has changed. So if that's the case, we're looking at an employer that's basically handcuffed from protecting itself from violating wage and hour laws, immigration laws, workers' compensation requirements, unemployment requirements. Schwanz has to be able to protect itself and it should be able to protect itself as a matter of Montana law. So why wouldn't a suspension have accomplished those goals? I don't know the answer to that, Your Honor, but ultimately the decisions that have been made in every situation of this policy violation is termination. Whenever management has known of it, senior management has known of it, they've terminated. So to be consistent, they've terminated Mr. Blair's employment. Any further questions? No. Thank you, Your Honor. The case is heard and will be submitted.
judges: O'connor, Reinhardt, Thomas